**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2351**

IN RE: LUMBER LIQUIDATORS CHINESE-MANUFACTURED FLOORING PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION (1:15-md-02627-AJT-TRJ).

IN RE: LUMBER LIQUIDATORS CHINESE-MANUFACTURED FLOORING DURABILITY MARKETING AND SALES PRACTICES LITIGATION. (1:16-md-02743-AJT-TRJ).

-----------------------------------------------

DIANA CANTU-GUERRERO,

Party-in-Interest – Appellant,

v.

LUMBER LIQUIDATORS, INC., a Delaware corporation,

Defendant – Appellee,

and

LAURA WASHINGTON, LILA WASHINGTON, MARIA RONQUILLO, ROMUALDO RONQUILLO, JOSEPH MICHAEL BALERO, RYAN BRANDT, KRISTIN BRANDT, DEVIN CLOUDEN, SARA CLOUDEN, KEVIN PARNELLA, JULIE PARNELLA, SHAWN BURKE, and TANYA BURKE, on behalf of themselves and all others similarly situated,

Formaldehyde MDL Plaintiffs – Appellees,

and

ERIN FLOREZ, JIM MOYLEN, KELLY RYAN, KAREN HOTALING, and LOGAN PEREL, on behalf of themselves and all others similarly situated,

Durability MDL Plaintiffs – Appellees.

IN RE: LUMBER LIQUIDATORS CHINESE-MANUFACTURED FLOORING PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION (1:15-md-02627-AJT-TRJ).

IN RE: LUMBER LIQUIDATORS CHINESE-MANUFACTURED FLOORING DURABILITY MARKETING AND SALES PRACTICES LITIGATION (1:16-md--02743-AJT-TRJ).

-------------------------------------------------

BRICE M. JOHNSTON,

            Party-In-Interest – Appellant,

      v.

LUMBER LIQUIDATORS, INC., a Delaware corporation,

            Defendant – Appellee,

      and

LAURA WASHINGTON, LILA WASHINGTON, MARIA RONQUILLO, ROMUALDO RONQUILLO, JOSEPH MICHAEL BALERO, RYAN BRANDT, KRISTIN BRANDT, DEVIN CLOUDEN, SARA CLOUDEN, KEVIN PARNELLA, JULIE PARNELLA, SHAWN BURKE, and TANYA BURKE, on behalf of themselves and all others similarly situated,

            Formaldehyde MDL Plaintiffs – Appellees,

      and

ERIN FLOREZ, JIM MOYLEN, KELLY RYAN, KAREN HOTALING, and LOGAN PEREL, on behalf of themselves and all others similarly situated,

            Durability MDL Plaintiffs – Appellees.

IN RE: LUMBER LIQUIDATORS CHINESE-MANUFACTURED FLOORING PRODUCTS MARKETING, SALES PRACTICES AND PRODUCTS LIABILITY LITIGATION (1:15-MD-02627-AJT-TRJ).

IN RE: LUMBER LIQUIDATORS CHINESE-MANUFACTURED FLOORING DURABILITY MARKETING AND SALES PRACTICES LITIGATION (1:16-m-02743-AJT-TRJ).

--------------------------------------------------

DIANA CANTU-GUERRERO,

            Party-In-Interest – Appellant,
      v.

LUMBER LIQUIDATORS, INC., a Delaware corporation,

      and

LAURA WASHINGTON, LILA WASHINGTON, MARIA RONQUILLO, ROMUALDO RONQUILLO, JOSEPH MICHAEL BALERO, RYAN BRANDT, KRISTIN BRANDT, DEVIN CLOUDEN, SARA CLOUDEN, KEVIN PARNELLA, JULIE PARNELLA, SHAWN BURKE, and TANYA BURKE, on behalf of themselves and all others similarly situated,

            Formaldehyde MDL Plaintiffs – Appellees,

      and

ERIN FLOREZ, JIM MOYLEN, KELLY RYAN, KAREN HOTALING, and LOGAN PEREL, on behalf of himself and all others similarly situated,

            Durability MDL Plaintiffs – Appellees.

Appeals from the United States District Court for the United States District Court of the Eastern District of Virginia, at Alexandria. Anthony John Trenga, District Judge. (1:15-md-02627-AJT-TRJ; 1:16-md-02743-AJT-TRJ)

———————————

Argued: January 29, 2020                    Decided: March 10, 2020

———————————

Before GREGORY, Chief Judge, and KING and QUATTLEBAUM, Circuit Judges.

———————————

Affirmed in part, vacated in part, and remanded by published opinion. Judge King wrote the opinion, in which Chief Judge Gregory and Judge Quattlebaum joined.

———————————

**ARGUED:** Robert William Clore, BANDAS LAW FIRM, PC, Corpus Christi, Texas; N. Albert Bacharach, Jr., N. ALBERT BACHARACH, JR. PA, Gainesville, Florida, for Appellants. Steven J. Toll, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C., for Appellees. **ON BRIEF:** Christopher A. Bandas, BANDAS LAW FIRM, PC, Corpus Christi, Texas, for Appellant Diana Cantu-Guerrero. Diane P. Flannery, Matthew Allen Fitzgerald, Andrew F. Gann, Jr., MCGUIREWOODS LLP, Richmond, Virginia; Daniel K. Bryson, Patrick M. Wallace, WHITFIELD BRYSON & MASON LLP, Raleigh, North Carolina; Douglas J. McNamara, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, D.C.; Niall McCarthy, Burlingame, California, Alexander E. Barnett, COTCHETT, PITRE & MCCARTHY, LLP, New York, New York; Steve W. Berman, Robert F. Lopez, HAGENS BERMAN SOBOL SHAPIRO LLP, Seattle, Washington; Alexander Robertson, IV, Mark Uyeno, ROBERTSON & ASSOCIATES, LLP, Westlake Village, California, for Appellees.

———————————

4

KING, Circuit Judge:

Diana Cantu-Guerrero and Brice Johnston (the "Objectors") pursue these consolidated appeals from the district court's October 9, 2018 order approving a class-action settlement and November 15, 2018 order awarding attorney's fees to the lawyers for the class members ("Class Counsel"). *See In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Practices & Prods. Liab. Litig.*, No. 1:15-md-02627 (E.D. Va. Oct. 9, 2018), ECF No. 1705 (the "Settlement Approval Order"); *id.* (E.D. Va. Nov. 15, 2018), ECF No. 1726 (the "Attorney's Fees Order"). The Settlement Approval Order resolves two Multidistrict Litigation ("MDL") proceedings related to Lumber Liquidators, Inc.'s sale of allegedly dangerous and defective laminate flooring to more than 760,000 customers from 2009 to 2015. The settlement required Lumber Liquidators to pay $22 million in cash and provide store vouchers with a face value of $14 million. Pursuant to the Attorney's Fees Order, Class Counsel received about $10 million of the $22 million in cash.

As explained below, we conclude that the district court did not abuse its discretion in approving the settlement and thus affirm the Settlement Approval Order. We are obliged, however, to vacate the Attorney's Fees Order because the court erred by not applying to the store vouchers the "coupon" settlement provisions of the Class Action Fairness Act of 2005 ("CAFA"). We remand for the district court to apply — in the first instance — those CAFA provisions in recalculating the attorney's fees award.

5

I.

A.

1.

Lumber Liquidators is "one of the largest specialty retailers of hardwood flooring and laminates in the United States." *See* J.A. 14.[1] The settlement prompting these appeals relates to Lumber Liquidators' sale of Chinese-manufactured laminate flooring to more than 760,000 customers from 2009 to 2015. In March 2015, purchasers of the laminate flooring began filing class-action lawsuits against Lumber Liquidators in federal courts across the country. The plaintiffs in those lawsuits alleged that the company had falsely represented to consumers that the flooring complied with the California Air Resource Board's ("CARB") formaldehyde emission limits, which are some of the strictest in the country. According to those plaintiffs, Lumber Liquidators uses formaldehyde to make its laminate flooring, and — as a result of excess levels of the chemical therein — the flooring releases dangerous amounts of formaldehyde gas into the air. Those plaintiffs further alleged that short-term exposure to formaldehyde causes eye, nose, throat, and skin irritation, plus coughing, headaches, and nausea, and that long-term exposure to formaldehyde increases the risk of developing cancer.

In June 2015, the United States Judicial Panel on Multidistrict Litigation consolidated the federal lawsuits and transferred them to the Eastern District of Virginia,

---

[1] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in these appeals.

where they proceeded as an MDL under case number 1:15-md-02627 (the "Formaldehyde MDL"). About three months later, in September 2015, the plaintiff class members in the Formaldehyde MDL filed an amended representative class-action complaint.[2] After the district court denied in part and granted in part Lumber Liquidators' motion to dismiss the complaint in December 2015, the Formaldehyde MDL proceeded to discovery. During discovery, the parties reviewed hundreds of thousands of documents and deposed twenty-six fact witnesses and ten expert witnesses. The parties completed fact discovery in early 2016. In August 2016, Lumber Liquidators moved for summary judgment in the Formaldehyde MDL, and the court — by a lengthy written opinion issued in June 2017 — granted in part and denied in part that motion.

2.

In May 2015 — about two months after the initiation of the lawsuits that would become the Formaldehyde MDL — purchasers of the same Lumber Liquidators laminate flooring began filing lawsuits against the company, alleging that it had falsely represented to consumers that the flooring satisfied various industry durability standards. In October 2016, the Judicial Panel on Multidistrict Litigation consolidated those lawsuits and transferred them to the Eastern District of Virginia, where they were assigned to the district judge presiding over the Formaldehyde MDL and proceeded as an MDL under case number 1:16-md-02743 (the "Durability MDL").

_____

[2] Although we generally refer to the plaintiffs in these proceedings as "class members," the two classes in these MDLs were not certified pursuant to Rule 23 of the Federal Rules of Civil Procedure until the Settlement Approval Order on October 9, 2018.

7

In February 2017, the plaintiffs in the Durability MDL filed a representative class-action complaint. Five months later, in July 2017, the district court granted in part and denied in part Lumber Liquidators' motion to dismiss that complaint. Discovery thereafter commenced, during which the parties conducted thirteen depositions and reviewed vast quantities of documents. The court stayed discovery in the Durability MDL for purposes of settlement negotiations in August 2017.

B.

1.

After mediations between the parties in the Formaldehyde MDL in December 2015 and July 2016, and combined settlement discussions relating to both MDLs during most of 2017, the parties eventually agreed to key settlement terms, as reflected in an October 23, 2017 Memorandum of Understanding. The parties thereafter submitted the settlement terms to the district court for preliminary approval on March 15, 2018.

The terms of the proposed settlement agreement were as follows. In exchange for a release of all claims by class members in both the Formaldehyde MDL and the Durability MDL, Lumber Liquidators would create a non-reversionary "common fund" consisting of $22 million in cash, plus Lumber Liquidators vouchers with a face value of $14 million.[3] Because CARB's 2015 formaldehyde emission standards were different from its 2009

_____

[3] The proposed settlement agreement created a "common fund," which has been defined as a "monetary amount recovered by a litigant or lawyer for the benefit of a group that includes others, the litigant or lawyer then being entitled to reasonable attorney's fees from the entire amount." *See* Black's Law Dictionary (11th ed. 2019).

8

standards, the settlement would place the class members into two groups. The first group (the "CARB1 Class") would be composed of customers who purchased the flooring from Lumber Liquidators between January 1, 2009, and December 31, 2010. And the second group (the "CARB2/Durability Class") would consist of customers who purchased the same type of flooring between January 1, 2011, and May 31, 2015.

As a result of the different CARB standards for formaldehyde emissions, the proposed benefits for the classes differed. Members of the CARB1 Class could make a claim for an expected $50 cash award, but only $1 million of the $22 million common fund cash would be set aside for that Class. The cash award would thus be reduced if the claim participation rate exceeded the parties' estimates. And the CARB1 Class would not have the option to select a Lumber Liquidators voucher instead of cash.

On the other hand, the CARB2/Durability Class could choose either a cash payment or a Lumber Liquidators voucher. In most states, the vouchers would be redeemable for three years after the settlement date.[4] And in all states, the vouchers would be transferrable to a family member or certain charities, if the class member did so within twenty days of electing the voucher. The vouchers could not, however, be sold or redeemed for cash. Each CARB2/Durability Class member who participated in the settlement would receive cash or a voucher in an amount equal to a percentage of the price that he or she paid for the flooring. The percentage of purchase price would be universal to those class members and

_____

[4] In forty of the fifty states, the Lumber Liquidators vouchers would expire in three years. As for the other ten states, in seven, the vouchers would have no expiration date, and in three, the vouchers would be valid between four and six years.

9

would depend on the number of claims submitted and the remedy elected for each claim. In addition to the awards that the CARB1 Class and the CARB2/Durability Class would receive, twelve named class members would each receive a "service award" of $5,000.

The proposed settlement agreement also provided that Class Counsel could apply for (1) an award of attorney's fees that equaled one-third of the total settlement, and (2) costs and expenses. Class Counsel would receive the fees, costs, and expenses awarded by the district court within thirty-one days of the court's final settlement approval, notwithstanding any appeal therefrom (the so-called "quick-pay provision").[5] By contrast, any appeal from the court's final settlement approval would prevent payments (cash and vouchers) to class members. If an appellate court vacated the award of attorney's fees, Class Counsel would refund the money to an escrow account within ten days.

---

[5] The quick-pay provision of the proposed settlement agreement provides in pertinent part:

> Within thirty-one (31) days of Final Approval Order and Judgment and entry by the Court of an order awarding attorneys' fees, costs, and expenses ("Fee, Cost, and Expense Order"), any awarded attorneys' fees, costs, and expenses shall be paid to Class Counsel . . ., notwithstanding the existence of or pendency of any appeal or collateral attack on the Settlement or any part thereof or the Fee, Cost, and Expense Order. In the event that . . . the Fee, Cost, and Expense Order is reversed or modified pursuant to a final court order and attorneys' fees, costs, and expenses have been paid out . . ., then Class Counsel shall be obligated and does hereby agree, within ten (10) business days after receiving notice of the foregoing from Defendants' Counsel or from a court of appropriate jurisdiction, to refund to the Escrow Account such attorneys' fees, costs, and expenses that have been paid . . . .

*See* J.A. 407.33.

Additionally, the proposed settlement agreement contained a section explaining that the agreement would automatically terminate in certain circumstances. That section provides in relevant part:

> If this Settlement Agreement; the order preliminarily approving the Settlement Agreement and/or Final Order and Judgment approving this Settlement Agreement is vacated, materially modified or reversed, in whole or part, this Settlement Agreement will be deemed terminated, unless the Parties, in their sole discretion within thirty (30) days of receipt of such ruling, agree to proceed with the Settlement Agreement as modified by the Court or on appeal.

*See* J.A. 407.41. The agreement thus would not terminate upon the vacatur or modification of any attorney's fees award.

As part of the proposed settlement agreement, the parties specified a plan for providing notice to class members. The notice to members of the CARB2/Durability Class would inform them that they would likely receive between 20 and 56 percent of the purchase price of their flooring if they chose the cash award, and between 38 and 104 percent of the purchase price of their flooring if they chose the vouchers. Conversely, the notice provided no estimate of the cash award that a member of the CARB1 Class might receive.

On June 15, 2018, the district court entered an order conditionally certifying the two classes proposed in the settlement agreement, preliminarily approving the proposed settlement agreement, and assenting to the parties' notice plan. Pursuant to that plan, the court-appointed Claims Administrator sent more than one million emails and postcards, and created online banner advertisements for the settlement. The Claims Administrator also established a telephone hotline and a website for class members. Approximately 73%

11

of class members received notice through those efforts, and about 24% of them responded (that is, 178,859 out of 761,390 class members responded).

2.

On August 17, 2018, before the district court made a final ruling on the proposed settlement agreement, Class Counsel moved for attorney's fees in the amount of $11,160,000. According to Class Counsel, that amount represented 31% of the value of the settlement ($22 million in cash + $14 million in vouchers = $36 million. 11,160,000/36,000,000 = 0.31). The attorney's fees were to be paid from the $22 million cash portion of the common fund established by the proposed settlement agreement.

3.

On September 4, 2018, Diana Cantu-Guerrero — a member of the CARB2/Durability Class — objected by counsel to the proposed settlement agreement. In her objection papers, she emphasized that Class Counsel had formerly estimated that a jury could award more than $750 million in damages, and she questioned why the settlement amount was substantially less. Insofar as Class Counsel had previously justified the reduced settlement amount predicated on Lumber Liquidators' "financial distress," Cantu-Guerrero questioned (1) whether that financial distress would cause the vouchers to become worthless, and (2) why — pursuant to the quick-pay provision for attorney's fees — Class Counsel should be paid in cash before the class members, which would leave class members "to wait and bear the risk of" Lumber Liquidators' purported financial distress.

12

*See* J.A. 76.[6]  Based on those concerns, Cantu-Guerrero asserted that "vouchers should not be the primary form of class recovery," and that "class counsel should not be paid" before the class members.  *Id.* at 78.

Cantu-Guerrero also contended that, in calculating the attorney's fees award for Class Counsel, the district court should insist on a "meaningful" disclosure of billing records from Class Counsel given the amount of fees requested and the potential for duplicative billing.  *See* J.A. 84.  Moreover, she argued that the court "should not treat the $14 million in vouchers as cash when calculating fees."  *Id.* at 85.

About a week after Cantu-Guerrero lodged her objections, Brice Johnston — also a member of the CARB2/Durability Class — objected to the proposed settlement agreement.  He asserted that the Lumber Liquidators vouchers were "coupons" for CAFA's purposes and that CAFA "requires greater judicial scrutiny for the review of proposed class action settlements wherein the defendant provide[s] coupons in lieu of cash."  *See* J.A. 653.  According to Johnston, the vouchers were not worth $14 million, despite their face value, and should not be so valued in calculating the attorney's fees award for Class Counsel.

---

[6] Around the time that the formaldehyde lawsuits began in March 2015, the television program *60 Minutes* aired an episode revealing that Lumber Liquidators had falsely represented to consumers that certain flooring it sold was compliant with CARB's formaldehyde emission limits.  Lumber Liquidators' stock price dropped by about half after the broadcast of that episode.  As of August 2018, the company's stock price was about $17 per share.  In addition to the decrease in stock price, Lumber Liquidators experienced other financial problems during the pendency of these MDLs.  For instance, the company destroyed millions of dollars in inventory and paid millions in regulatory fines.

13

C.

1.

On October 3, 2018, the district court conducted a settlement approval hearing in Alexandria. During that hearing, Class Counsel reported that "[o]ut of 760,000 class members, roughly, 178,900 or so have participated." *See* J.A. 939. Class Counsel also explained that ninety-four class members had opted out of the proposed settlement agreement and that twelve class members had objected to it. None of the objecting class members appeared at the hearing.

According to Class Counsel, about 15% of the CARB2/Durability Class had selected Lumber Liquidators vouchers and about 85% of that Class had selected the cash award. Consequently, those class members who requested vouchers would receive vouchers representing about 60% of the price that they paid for the flooring ($703 on average). And the class members who selected cash would receive about 5.5% of the price that they paid for the flooring, after a reduction of the common fund by $11,160,000 to pay attorney's fees.

Given the popularity of the cash option among the class members, Class Counsel asked Lumber Liquidators' lawyer whether the company could convert the vouchers to cash, and it could not. Notwithstanding Lumber Liquidators' apparent cash flow problems, Class Counsel remarked that Lumber Liquidators was not on the brink of insolvency and that, even if it were, the vouchers could be used to obtain existing inventory. Additionally, Class Counsel rejected the notion that the vouchers were "akin" to "coupon" relief for CAFA's purposes and explained that the vouchers could help some class members "get a

new floor." *See* J.A. 950. Counsel for Lumber Liquidators simply requested that the court approve the settlement.

2.

On October 9, 2018, the district court entered the Settlement Approval Order, certifying the proposed settlement classes (that is, the CARB1 Class and the CARB2/Durability Class) and approving the proposed settlement agreement as fair, reasonable, and adequate. The court ruled that the settlement is fair because: (1) "the parties had ample time to develop the case[s] and consider [their] merits and the potential costs and benefits of taking the case[s] further"; (2) the parties conducted "extensive" discovery in both the Formaldehyde and Durability MDLs; (3) the settlement was "a product of extensive mediation and negotiation between the parties conducted over more than two years"; and (4) both Class Counsel and Lumber Liquidators' counsel had experience in complex civil litigation. *See* Settlement Approval Order 8.

Furthermore, the district court determined that the settlement is adequate because, inter alia: (1) although the class members "would likely be able to proceed through a trial on the merits in both matters, both [MDLs] . . . present many challenges that make the classes' likelihood or amount of ultimate recovery uncertain," *see* Settlement Approval Order 10; (2) the settlement would "put an end to extensive litigation that could further erode [Lumber Liquidators'] ability to pay an eventual judgment or later settlement," *id.* at 10-11; (3) any "further litigation of the cases [would] be lengthy, complex, and expensive," *id.* at 11; (4) Lumber Liquidators "could never afford to satisfy a judgment that awarded [flooring purchasers] anything close to a full refund" — that is, about $824 million —

15

given its financial difficulties (including the drop in stock price, the destruction of millions of dollars in inventory, and the payment of millions in regulatory fines), *id.* at 12; and (5) the "low opt-out and objection rates indicate[d] widespread approval [of the proposed settlement agreement] among the class," *id.* at 13.

As for the objections to the proposed settlement agreement, the district court observed that several objectors challenged the settlement's adequacy and other objectors contested the amount of attorney's fees sought by Class Counsel. The court overruled the adequacy objections for the reasons described above and reserved ruling on the objections to the attorney's fees request.

D.

On November 15, 2018, the district court entered the Attorney's Fees Order, awarding $10,080,000 in attorney's fees and $797,397 in costs and expenses to Class Counsel, and authorizing $1,194,500 in notice and administration costs. The court employed the percentage-of-recovery method for calculating attorney's fees and determined that an award equal to 28% of the $36 million settlement was reasonable. In so ruling, the court explained that: (1) Class Counsel obtained "satisfactory results" for class members in the face of both "significant questions remain[ing] in [the MDLs] that could have potentially foreclosed recovery" and Lumber Liquidators' financial distress, *see* Attorney's Fees Order 7-8; (2) Class Counsel "fashioned" the settlement "in a way to provide the most relief to those who are most likely to have been injured," *id.*; (3) there was a "low number of objections to the requested fee award," *id.* at 10; (4) Class Counsel "consistently performed to a high standard," *id.* at 11; (5) the litigation was complex and

16

spanned years; and (6) Class Counsel avoided the potential risk of "partial or complete nonpayment" to the class members, *id.* at 12. Notwithstanding, the court concluded that Class Counsel's requested award of 31% of the settlement amount was "higher than the median award in common fund cases, both nationwide and in the Fourth Circuit," and thus the court reduced the requested award to 28% of the settlement amount. *Id.*

After arriving at the 28% figure, the district court performed a "lodestar cross-check." *See* Attorney's Fees Order 14.[7] In so doing, the court concluded that the "aggregate lodestar" was $12.5 million (24,000 hours expended x $524 per hour = $12.5 million), which was more than the award requested by Class Counsel ($11,160,000). *Id.* Although the court determined that the "lodestar cross-check supports the reasonableness of [Class Counsel's] requested fee award" of 31%, the court remained convinced that a 28% award was most appropriate. *Id.* at 15.

As for the objections to the requested attorney's fees award, the district court observed that several objectors contended that the court should not attribute a $14 million value to the Lumber Liquidators vouchers when assessing the value of the settlement for purposes of calculating attorney's fees. Those objectors asserted that the vouchers

_____

[7] A "lodestar" in the attorney's fees context means "[a] reasonable amount of attorney's fees in a given case, usu[ally] calculated by multiplying a reasonable number of hours worked by the prevailing hourly rate in the community for similar work." *See* Black's Law Dictionary (11th ed. 2019). A so-called "lodestar cross-check" is the comparison of (1) a calculation of attorney's fees using the percentage-of-recovery method to (2) a rough or imprecise lodestar calculation. *See In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 305-06 (3d Cir. 2005) (explaining lodestar cross-check concept). As its name suggests, the lodestar cross-check is used to ensure that an attorney's fees award calculated under the percentage-of-recovery method is reasonable. *Id.*

constitute "coupons" within the meaning of CAFA, and that CAFA requires "the portion of any attorney's fee[s] award to class counsel that is attributable to the award of the coupons [to] be based on the value to class members of the coupons that are redeemed." *See* Attorney's Fees Order 9 (quoting 28 U.S.C. § 1712(a)). The court overruled those objections, concluding that the vouchers are not "coupons" because the vouchers are "more akin to gift cards" in that "they entitle the bearer to obtain [Lumber Liquidators'] inventory at the same exchange rate as customers who purchase [Lumber Liquidators'] flooring products with cash and do not require class members to make additional purchases with their own money in order to obtain the products eligible to be purchased with the vouchers." *Id.* The court also emphasized that the vouchers "are guaranteed, redeemable for three years, transferrable to family members, and carry an average value in the hundreds of dollars." *Id.*

E.

On January 31, 2019, the district court entered an Order of Dismissal and Judgment. Based on the settlement, the court dismissed with prejudice all claims in the Formaldehyde MDL and the Durability MDL, save those claims by class members who opted out of the settlement. The Objectors timely noticed separate appeals from the Settlement Approval Order, the Attorney's Fees Order, and the Order of Dismissal and Judgment. We possess jurisdiction pursuant to 28 U.S.C. § 1291.

18

## II.

On appeal, the Objectors maintain their opposition to the Settlement Approval Order and the Attorney's Fees Order. We review a district court's approval of a class-action settlement for an abuse of discretion. *See Sharp Farms v. Speaks*, 917 F.3d 276, 299 (4th Cir. 2019) ("This Court affords the district court's decision substantial deference, reversing only upon a clear showing that the district court abused its discretion in approving the settlement." (internal quotation marks omitted)). We also review an award of attorney's fees for an abuse of discretion. *See Berry v. Schulman*, 807 F.3d 600, 617 (4th Cir. 2015) (explaining that our review of an attorney's fees award is "sharply circumscribed, and a fee award must not be overturned unless it is clearly wrong" (internal quotation marks omitted)). A court abuses its discretion when it commits an error of law, or when it relies on a clearly erroneous factual finding. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 171 (4th Cir. 2019). Lastly, we review de novo a question of statutory interpretation, such as the applicability of CAFA's "coupon" settlement provisions to these proceedings. *See Roe v. Howard*, 917 F.3d 229, 239 (4th Cir. 2019).

## III.

Our analysis of these consolidated appeals proceeds in three steps. First, we resolve the Objectors' arguments against the Settlement Approval Order, which we are satisfied lack merit. Second, we assess the Objectors' challenges to the Attorney's Fees Order. Because the "coupon" settlement provisions of CAFA apply to the Lumber Liquidators vouchers, and the district court erred in ruling otherwise, we are constrained to vacate the

19

Attorney's Fees Order. Consequently, in the third step of our analysis, we decide whether the Settlement Approval Order survives our vacatur of the Attorney's Fees Order. And we are convinced that it does.

A.

The Objectors first contend that the district court abused its discretion in approving the class-action settlement. They argue that the settlement is both unfair and inadequate because, inter alia, (1) the vouchers "may prove worthless" if Lumber Liquidators declares bankruptcy, and (2) Class Counsel secured much of the cash from the settlement for themselves. *See* Br. of Appellants 22. The Objectors also assail the settlement on the ground that the quick-pay provision is unreasonable, and they fault the court for failing to explicitly address Cantu-Guerrero's objection to that provision before approving the settlement. For the reasons set forth below, we are satisfied that the court did not abuse its discretion in approving the class-action settlement.

1.

Rule 23(e) of the Federal Rules of Civil Procedure obliges parties to seek approval from the district court before settling a class-action lawsuit. *See* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class — or a class proposed to be certified for purposes of settlement — may be settled, voluntarily dismissed, or compromised only with the court's approval."). When the court reviews a proposed class-action settlement, it acts as a fiduciary for the class. *See Sharp Farms v. Speaks*, 917 F.3d 276, 293-94 (4th Cir. 2019). And the court may approve the proposed settlement "only after a hearing and only

20

on finding that [the proposed settlement] is fair, reasonable, and adequate." *See* Fed. R. Civ. P. 23(e)(2).

Our Court has developed multifactor standards for assessing whether a class-action settlement is "fair, reasonable, and adequate" under Rule 23(e)(2).[8] More specifically, we have identified four factors for determining a settlement's fairness, which are:

(1) the posture of the case at the time settlement was proposed;

(2) the extent of discovery that had been conducted;

(3) the circumstances surrounding the negotiations; and

(4) the experience of counsel in the area of [the] class action litigation.

*See In re Jiffy Lube Sec. Litig.*, 927 F.2d 155, 159 (4th Cir. 1991). Although we have not enumerated factors for assessing a settlement's reasonableness, we have specified the following factors for assessing its adequacy:

(1) the relative strength of the plaintiffs' case on the merits;

(2) the existence of any difficulties of proof or strong defenses the plaintiffs are likely to encounter if the case goes to trial;

(3) the anticipated duration and expense of additional litigation;

(4) the solvency of the defendant[] and the likelihood of recovery on a litigated judgment; and

_____

[8] On December 1, 2018 — about two months after the district court entered the Settlement Approval Order — Rule 23(e)(2) was amended to specify factors for assessing the "fairness, reasonableness, and adequacy" of a class-action settlement. *See* Fed. R. Civ. P. 23(e)(2). We have, however, continued to apply our own multifactor standards when reviewing settlements approved by district courts prior to the amendments to Rule 23(e)(2). *See Sharp Farms*, 917 F.3d at 299. In any event, because our factors for assessing class-action settlements almost completely overlap with the new Rule 23(e)(2) factors, the outcome of these appeals would be the same under both our factors and the Rule's factors.

21

(5) the degree of opposition to the settlement.

*Id.* At bottom, in reviewing a district court's decision to approve a class-action settlement as fair, reasonable, and adequate, we give considerable deference thereto because the court "is exposed to the litigants, and their strategies, positions[,] and proofs," and "is on the firing line and can evaluate the action accordingly." *See Joel A. v. Giuliani*, 218 F.3d 132, 139 (2d Cir. 2000) (internal quotation marks omitted).

2.

a.

In the circumstances, we are satisfied that the district court did not abuse its discretion in ruling that the settlement is fair. First, by the time of the settlement, the parties in the Formaldehyde MDL had litigated a motion to dismiss and a motion for summary judgment, and discovery had been completed. And, at the time of settlement, the parties in the Durability MDL had litigated a motion to dismiss and also conducted significant discovery by deposing thirteen witnesses and reviewing vast quantities of documents — all of which weighs in favor of the court's fairness determination. *See Berry v. Schulman*, 807 F.3d 600, 614 (4th Cir. 2015) (concluding that settlement was fair where "extensive discovery" had been conducted by time of settlement). Second, the parties engaged in arm's length negotiations and participated in several mediations before arriving at the settlement. *See id.* (explaining that "[t]he fairness analysis is intended primarily to ensure that a settlement is reached as a result of good-faith bargaining at arm's length, without collusion" (alterations and internal quotation marks omitted)). And finally, many of the

22

lawyers involved in these MDLs have extensive experience in complex civil litigation. For those reasons, the court did not abuse its discretion in determining that the settlement is fair.

b.

We are likewise satisfied that the district court did not abuse its discretion in concluding that the settlement is adequate. The court was intimately familiar with the strength of the claims in both MDLs, along with "the existence of any difficulties of proof or strong defenses [that] the [class members were] likely to encounter" if the claims proceeded to trial. *See In re Jiffy Lube Sec. Litig.*, 927 F.2d at 159. Indeed, the court issued two exhaustive memorandum opinions resolving dispositive motions in the Formaldehyde MDL, plus another thorough opinion deciding a motion to dismiss pursued in the Durability MDL. As to the Formaldehyde MDL, the court determined that the merits of the class members' claims are strong, but it found that the class members might have difficulty accurately proving damages at trial. And, with respect to the Durability MDL, the court found that the strength of the class members' claims was less certain and that designing a model for "damages resulting from warped or scratched floors" might be onerous. *See* Settlement Approval Order 10. The Objectors do not contest those findings on appeal. At bottom, the course of these proceedings and the findings in the Settlement Approval Order demonstrate that, before approving the settlement, the court carefully assessed the merits of the claims in both MDLs, plus any difficulties of proof related to those claims and the possible defenses thereto.

Moreover, as the district court aptly concluded, further litigation of both MDLs would have been expensive and likely lengthy. For example, in the Durability MDL, the parties would have needed to conduct some additional discovery, and potentially litigate summary judgment motions. And Class Counsel estimated that litigating both MDLs through trial would cost tens of millions of dollars. Weighed against the benefits of this settlement, that considerable potential cost supports the district court's adequacy determination. *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005) (affirming approval of class-action settlement when lawsuit would "likely drag on for years" and require "expenditure of millions of dollars" (internal quotation marks omitted)).

Importantly, Class Counsel had valid concerns about Lumber Liquidators' ability to satisfy litigated judgments in both MDLs. Although the record does not reflect that Lumber Liquidators was planning to pursue bankruptcy proceedings at the time of the Settlement Approval Order, the district court found that the company could not satisfy a judgment awarding "a full refund" of the flooring purchase price in light of the company's "limited cash reserves." *See* Settlement Approval Order 12. Lumber Liquidators' potential inability to pay litigated judgments in both MDLs weighs in favor of the court's adequacy ruling.

Finally, only 94 of the 178,859 class members who responded to the class-action settlement notice opted out of the settlement (about 0.05%), and 12 class members objected thereto (about 0.006%). Those figures provide further support for the settlement's adequacy. *See Does 1-2 v. Déjà Vu Servs., Inc.*, 925 F.3d 886, 899 (6th Cir. 2019) (explaining that opt-out rate of about 0.2% and objection rate of about 0.02% supported

24

ruling that settlement is adequate); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1174 (4th Cir. 1975) (affirming approval of class-action settlement where 5 of 253 class members objected thereto). For those reasons, we conclude that the district court did not abuse its discretion in its adequacy ruling.

c.

At bottom, the Settlement Approval Order thoughtfully assessed what the class members "would give up in the proposed settlement, and then explain[ed] why — given their likelihood of success on the merits — the tradeoff embodied in the settlement" was fair, reasonable, and adequate. *See Shane Grp. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 309 (6th Cir. 2016). In the circumstances, we are satisfied that the district court's decision to approve the settlement is not an abuse of discretion. *See Sharp Farms*, 917 F.3d at 299 (emphasizing "substantial deference" afforded to district court's settlement approval decision).

None of the Objectors' challenges to the fairness and adequacy of the settlement convince us otherwise. Insofar as the Objectors contend that the vouchers "may prove worthless" if Lumber Liquidators pursues bankruptcy, nothing in this record confirms that the company plans to do so, notwithstanding its financial difficulties during the pendency of the MDLs. *See* Br. of Appellants 22. And the Objectors ignore that the settlement was structured to address any concerns about Lumber Liquidators' finances. *See Redman v. RadioShack Corp.*, 768 F.3d 622, 632 (7th Cir. 2014) (explaining that settlement providing coupons to class members was "prudent" given company's financial problems). Notably,

25

the Objectors do not dispute that, even if Lumber Liquidators declares bankruptcy, the vouchers might be used to obtain existing inventory.

The Objectors also argue that the settlement is both unfair and inadequate because Class Counsel secured much of the cash from the settlement for themselves. Although the proportion of the common fund cash awarded to Class Counsel in these proceedings gives us some pause, it alone does not mandate vacatur of the district court's decision to approve the settlement. *See Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1051 (9th Cir. 2019) (explaining that attorney's fees award alone, which constituted 50% of settlement cash, did not require vacatur of settlement). In any event, our decision today vacates the Attorney's Fees Order, and that vacatur resolves the Objectors' current contention. We observe, however, that if the district court were to award the same amount of attorney's fees after applying CAFA's "coupon" settlement provisions, that would not render the Settlement Approval Order infirm in light of our deferential standard for reviewing such decisions.

Next, the Objectors assert that the Settlement Approval Order should be vacated because the district court never assessed Cantu-Guerrero's objection to the quick-pay provision. They correctly observe that a court should meaningfully address serious challenges to a proposed class-action settlement. *See Sharp Farms*, 917 F.3d at 294 (ruling that court abused its discretion by using "conclusory statements" to reject "serious charges

26

of collusion" against settling parties). And we are entirely satisfied that the Settlement Approval Order clears that bar.[9]

On the merits of the quick-pay argument, the Objectors contend that the provision authorizes "up-front payment to class counsel and le[aves] the class at the mercy of [Lumber Liquidators'] financial volatility." *See* Br. of Appellants 17. We will not, however, nullify the Settlement Approval Order predicated on the Objectors' current speculation as to Lumber Liquidators' financial future. And, in any event, when the lawyers get paid matters little when, as here, there is no established danger that the nonmonetary relief awarded to the class will actually be rendered worthless, and Class Counsel have promised to refund (with interest) the fees awarded pursuant to the quick-pay provision if the Attorney's Fees Order is vacated. *See Pelzer v. Vassalle*, 655 F. App'x 352, 365 (6th Cir. 2016) ("The quick-pay provision does not harm the class members in any discernible way, as the size of the settlement fund available to the class will be the same regardless of when the attorneys get paid."); *see also* Br. of Appellees 31 (representing that Class Counsel "can return [the] funds [awarded] if approval of the settlement [is] revised in any way").

Additionally, we observe that quick-pay provisions have generally been approved by other federal courts. *See Pelzer*, 655 F. App'x at 365 (explaining "that over one-third of federal class action settlement agreements in 2006 included quick-pay provisions"); *In*

---

[9] And to the extent the district court failed to adequately address the objection to the quick-pay provision, for the reasons set forth herein, such failure caused no prejudice nor harm.

27

*re Optical Disk Drive Prods. Antitrust Litig.*, No. 3:10-md-02143, slip op. at 21-22 (N.D. Cal. Dec. 19, 2016), ECF No. 2133 (overruling objection to similar quick-pay provision and collecting decisions that have done same). We discern no reason to buck that trend in these proceedings. We therefore decline to vacate this carefully crafted and vigorously reviewed class-action settlement because the court did not explicitly address a single objection thereto, the substance of which borders on frivolous when considered in the full context of these proceedings. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 895 F.3d 597, 613 (9th Cir. 2018) (explaining that an appellate court is "reluctant in the extreme" to vacate a class-action settlement based on a potentially frivolous unaddressed objection). For those reasons, we are satisfied that the Objectors have not made the requisite "clear showing that the district court abused its discretion in approving the settlement." *See Sharp Farms*, 917 F.3d at 299.

## B.

Next, the Objectors maintain that the district court legally erred in its Attorney's Fees Order. More specifically, they assert that the court wrongly failed to apply CAFA's provisions governing "coupon" settlements when calculating the attorney's fees award. That is, the Objectors maintain that the Lumber Liquidators vouchers are "coupon" relief within the meaning of CAFA. If the court had applied CAFA's "coupon" settlement

28

provisions, the Objectors predict that the attorney's fees award would have been much less.[10]

In response, Class Counsel and Lumber Liquidators maintain that the vouchers are not "coupons" for the purposes of CAFA because the vouchers are worth "many hundreds of dollars on average," provide more than a mere discount on Lumber Liquidators' products, are "considerably transferrable," and do not expire for at least three years. *See* Br. of Appellees 36, 40. Even if the vouchers are "coupons," Class Counsel and Lumber Liquidators argue that CAFA's provisions regulating attorney's fees awards in "coupon" settlements are inapplicable when part of the relief provided to the class members is cash.

We review de novo the district court's decision that CAFA's "coupon" settlement provisions are inapplicable here. *See Roe v. Howard*, 917 F.3d 229, 239 (4th Cir. 2019). As will be explained, we are satisfied that the Lumber Liquidators vouchers are "coupons" under CAFA and that the Act's provisions for calculating attorney's fees in a "coupon" settlement are applicable to this settlement. Because the court erred in ruling otherwise, we vacate the Attorney's Fees Order and remand.

1.

We have recognized that "Congress enacted CAFA in 2005 to address abuses of the class action device." *See Johnson v. Advance Am.*, 549 F.3d 932, 935 (4th Cir. 2008).

---

[10] The Objectors also pursue two other challenges to the Attorney's Fees Order. In particular, they contend that the district court abused its discretion by not directing Class Counsel to submit more detailed billing records and by valuing the Lumber Liquidators vouchers at $14 million. Because we vacate the Attorney's Fees Order for other reasons, we need not resolve those issues.

29

"One such perceived abuse is the coupon settlement," by which the defendant gives class members coupons or vouchers but pays the lawyers in cash. *See In re HP Inkjet Printer Litig.*, 716 F.3d 1173, 1177 (9th Cir. 2013). CAFA regulates "coupon" settlements in two primary ways: (1) the Act authorizes a court to approve a "coupon" settlement "only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members," *see* 28 U.S.C. § 1712(e); and (2) the Act requires a court to use specific rules in calculating attorney's fees for a "coupon" settlement case, *id.* § 1712(a)-(c). Congress targeted attorney's fees awards in "coupon" settlements out of a concern that such awards had been regularly inflated by the courts' unreasonable acceptance of the face value of nonmonetary relief. *See In re Easysaver Rewards Litig.*, 906 F.3d 747, 755 (9th Cir. 2018). In those circumstances, lawyers for the class might "reap the lion's share of the [settlement] benefits" while leaving the class members with little reward. *Id.*

CAFA's "coupon" settlement provisions governing attorney's fees, codified at 28 U.S.C. § 1712(a)-(c), have been universally criticized as "badly drafted." *See Galloway v. Kansas City Landsmen, LLC*, 833 F.3d 969, 973 (8th Cir. 2016). And Congress's enigmatic writing in that respect has caused the federal courts of appeals to diverge on the operation of those provisions. *Id.* at 974-75 (summarizing disagreement between Seventh and Ninth Circuits regarding available methods for calculating attorney's fees pursuant to § 1712(a)-(c)). For purposes of these appeals, it suffices to say that, if CAFA's "coupon" settlement provisions apply, the Attorney's Fees Order would be undermined, and the attorney's fees award would need to be recalculated.

30

Crucially, the attorney's fees provisions of § 1712(a)-(c) apply only when a class-action settlement awards "coupon" relief. Although CAFA does not define "coupon," there are several sources from which we can derive the meaning for that term, including CAFA's legislative history, contemporary dictionaries, and the decisions of other courts. First, CAFA's legislative history identifies those types of class-action settlements about which Congress was concerned when it enacted CAFA's "coupon" settlement provisions. For example, Senate Report No. 109-14 — which contains the Senate Judiciary Committee's views with respect to "coupon" settlements — criticizes past settlements that provided class members with "a $5 to $10 voucher good for future purchases of particular computer hardware or software products," $55 to use on a purchase of a new crib from a crib producer accused of making defective cribs, and discounted and free bottled water from a company that purportedly misrepresented the source of its water. *See* S. Rep. No. 109-14, at 16-17 (2005).[11] And CAFA's legislative history suggests that the label assigned to class relief is not dispositive of the "coupon" question. *Id.* at 16, 18-20 (criticizing settlements in which relief awarded was labelled "voucher").

Second, contemporary dictionaries generally define a "coupon" as an item that entitles its holder to a free or discounted product. One such dictionary describes a "coupon" as "a voucher entitling the holder to a discount for a particular product." *See* New Oxford

---

[11] Both the Supreme Court and our Court have previously "had occasion to rely on Senate Report No. 109-14" when assessing CAFA's provisions. *See Dominion Energy, Inc. v. City of Warren Police & Fire Ret. Sys.*, 928 F.3d 325, 336 n.11 (4th Cir. 2019) (citing *Dart Cherokee Basin Operating Co. v. Owens*, 574 U.S. 81, 89 (2014)).

American Dictionary 389 (2d ed. 2005). And another widely used dictionary explains that a "coupon" is "a small piece of paper that allows one to get a service or product for free or at a lower price." *See* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/coupon (last visited March 6, 2020).

Third, the federal courts of appeals have developed standards for determining whether a settlement award constitutes "coupon" relief under CAFA. In answering that question, the Ninth Circuit assesses: "(1) whether class members have to hand over more of their own money before they can take advantage of a credit, (2) whether the credit is valid only for select products or services, and (3) how much flexibility the credit provides, including whether it expires or is freely transferrable." *See In re Easysaver Rewards Litig.*, 906 F.3d at 755 (internal quotation marks omitted). And the Seventh Circuit considers factors similar to those developed by the Ninth Circuit, including whether the relief "force[s] future business with the defendant and . . . the likelihood that the full amount of [the defendant's] gains will not be disgorged." *See Synfuel Tech., Inc. v. DHL Exp. (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006); *see also In re Sw. Airlines Voucher Litig.*, 799 F.3d 701, 706 (7th Cir. 2015) (summarizing additional factors, including whether "the coupons have modest value compared to the new purchase for which they must be used," and whether "the coupons expire soon, are not transferable, and/or cannot be aggregated").

2.

a.

Utilizing all three sources for defining "coupon" for CAFA's purposes, we are convinced that the Lumber Liquidators vouchers are "coupons." As CAFA's legislative

32

history makes clear, labeling the relief awarded to the class as "vouchers" is not dispositive. *See* S. Rep. No. 109-14, at 16, 18-20; *Redman*, 768 F.3d at 635-36 (rejecting distinction between "coupon" and "voucher" for purposes of CAFA's "coupon" settlement provisions). And the vouchers here present at least two interconnected concerns that Congress targeted by way of CAFA's "coupon" settlement provisions. First, the vouchers require class members to do business with Lumber Liquidators in the future. *See* S. Rep. No. 109-14, at 15 (explaining Congress's concern that "coupon settlements" require class members to do future business with defendant); *Synfuel Tech., Inc.*, 463 F.3d at 654 (recognizing the concern that "coupon" relief "force[s] future business with the defendant"). Second, and relatedly, nothing in the record suggests that the vouchers will allow each class member to replace entirely his or her purportedly defective flooring. Class members thus may very well have to spend money to rid themselves of such flooring. *See* S. Rep. No. 109-14, at 15 (emphasizing Congress's concern that "coupon settlements" might oblige class members "to purchase more products" from defendant); *In re Easysaver Rewards Litig.*, 906 F.3d at 757 (explaining that "coupon" relief exists when class members are obliged to spend more money with defendant).[12] Of course, in having to spend more money to obtain sufficient relief, the class members will be forced to benefit the company that allegedly lied to and injured them. That arrangement is precisely the type about which

---

[12] Even if the vouchers permitted class members to replace entirely their defective flooring, that would not be dispositive of the "coupon" issue. *See* S. Rep. No. 109-14, at 17-18 (criticizing settlements that awarded entire product to class members); *Redman*, 768 F.3d at 635 ("[T]he idea that a coupon is not a coupon if it can ever be used to buy an entire product doesn't make any sense, certainly in terms of [CAFA].").

Congress was concerned. CAFA's legislative history thus supports treating the Lumber Liquidators vouchers as "coupons."

Next, the Lumber Liquidators vouchers fit comfortably within the contemporary dictionary definitions of a "coupon." That is, the vouchers are items that entitle their holders to obtain discounted or free flooring and flooring-related products. Accordingly, the vouchers are within the generally understood meaning of a "coupon." *See Tyler v. Michaels Stores, Inc.*, 150 F. Supp. 3d 53, 60 & n.14 (D. Mass. 2015) (summarizing dictionary definitions of a "coupon" and concluding that a "coupon" is an item that allows its "bearer to go to a particular store to receive an entitlement").

We are also confident that the vouchers are "coupons" under the standards developed by other courts of appeals. More specifically, pursuant to the Ninth Circuit's three-factor model, the vouchers are "coupons." Under the first factor thereof, class members will likely "have to hand over more of their own money" before they can take full advantage of the vouchers, which weighs in favor of applying CAFA's "coupon" settlement provisions. *See In re Easysaver Rewards Litig.*, 906 F.3d at 755 (internal quotation marks omitted). That is, in order to entirely replace their defective flooring, class members will be required to spend more money with Lumber Liquidators.

Second, the Lumber Liquidators vouchers can be used only "to purchase items from a limited universe of products," such as flooring and flooring tools. *See In re Easysaver Rewards Litig.*, 906 F.3d at 757. These vouchers are thus unlike gift cards to a "giant" retailer, which the Ninth Circuit has ruled are outside CAFA's "coupon" settlement provisions because they can be used to purchase a great variety of products. *See In re*

34

*Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 951 (9th Cir. 2015); *see also In re Easysaver Rewards Litig.*, 906 F.3d at 756-57 (contrasting $12 Walmart gift card, which Ninth Circuit ruled was not "coupon," with $20 discount for online retailer that sells flowers, chocolates, and similar items, which that court ruled was "coupon"). Notably, only about 15% of class members selected the vouchers over the cash award, which demonstrates that class members do not view the vouchers as having the diverse purchasing power of cash. Those characteristics weigh in favor of concluding that the vouchers are "coupons."

Third, these vouchers have somewhat limited flexibility. That is, they are dissimilar to other relief that has been deemed outside CAFA's "coupon" settlement provisions, in that they are transferrable for a limited period only to family members or to a charity, and they expire within three years in most states. *Cf. In re Online DVD-Rental Antitrust Litig.*, 779 F.3d at 951 (ruling that $12 Walmart gift card was not "coupon" because, inter alia, it was freely transferrable and did not expire). At best, the flexibility of the vouchers is a neutral factor here. For those reasons, the vouchers are "coupons" under the Ninth Circuit's three-factor standard. It follows that they are also "coupons" under the Seventh Circuit's less restrictive standard. *See In re Sw. Airlines Voucher Litig.*, 799 F.3d at 706 (describing factors that Seventh Circuit assesses); *Tyler*, 150 F. Supp. 3d at 59 (explaining that Seventh Circuit's definition of "coupon" is broader than that of Ninth Circuit).

b.

We are thus satisfied that the vouchers in these proceedings are "coupons" within the meaning of CAFA and that the district court erred in declining to apply CAFA's

"coupon" settlement provisions when calculating the attorney's fees award. Although Class Counsel and Lumber Liquidators contend that the court was not required to utilize those provisions because the settlement also includes a cash option, we are unconvinced. Indeed, both the Seventh and Ninth Circuits have applied CAFA's "coupon" settlement provisions to settlements awarding both cash and "coupon" relief. *See In re Easysaver Rewards Litig.*, 906 F.3d at 759 n.11; *In re Sw. Airlines Voucher Litig.*, 799 F.3d at 710.[13] We see no reason to depart from our sister circuits in these proceedings. To do so would defeat CAFA's purpose of exacting scrutiny of "coupon" settlements and permit parties to perform an end run around CAFA by including a nominal cash award as a settlement term. Because the district court erred in failing to apply CAFA's "coupon" settlement provisions here, we are obliged to vacate the Attorney's Fees Order.[14]

---

[13] In arguing that CAFA's "coupon" settlement provisions do not apply to settlements that allow a class member to select from a "coupon" and a cash award, Class Counsel and Lumber Liquidators rely primarily on unpublished decisions of the federal district courts in California. Those decisions predate, however, the Ninth Circuit's ruling in a published 2018 decision that CAFA's "coupon" settlement provisions apply to mixed settlements involving cash and "coupon" relief. *See In re Easysaver Rewards Litig.*, 906 F.3d at 759 n.11. Class Counsel and Lumber Liquidators also contend that a recent Sixth Circuit decision supports their position, but that court did not directly resolve the issue because it concluded that the relief awarded in those proceedings was not "coupon" relief at all. *See Déjà Vu Servs., Inc.*, 925 F.3d at 897.

[14] We observe that, on remand, the district court may be confronted with choosing among competing interpretations of CAFA's "coupon" settlement provisions governing attorney's fees. *Compare In re HP Inkjet Printer Litig.*, 716 F.3d at 1187 (9th Cir.) (ruling that court may not use lodestar method to calculate attorney's fees that are "attributable to" "coupon" relief), *with In re Sw. Airlines Voucher Litig.*, 799 F.3d at 707 (7th Cir.) (concluding the opposite). We generally refrain from deepening a circuit split when it is unnecessary to the disposition of an appeal, and we will follow that course in these appeals. *Cf. Holly v. Scott*, 434 F.3d 287, 301 (4th Cir. 2006) (Motz, J., concurring in the judgment) (Continued)

C.

Given our decision to vacate the Attorney's Fees Order, we are obliged to assess whether the Settlement Approval Order survives that decision. And we are satisfied that it does. Importantly, the validity of the settlement agreement has not been made contingent on our approval of the Attorney's Fees Order. Additionally, the district court complied with CAFA's requirements for court approval of a "coupon" settlement. That is, the court conducted a hearing on the proposed settlement and thereafter made written findings that "the settlement is fair, reasonable, and adequate for class members." *See* 28 U.S.C. § 1712(e). Moreover, we are confident that the district court "would not have made a different approval decision as to whether the settlement was fair, reasonable, and adequate" had it "known that the fee award would be recalculated." *See In re Easysaver Rewards Litig.*, 906 F.3d at 763.

Crucially, we are also satisfied that class members would not have made different decisions with respect to the settlement had they known that the attorney's fees award might be vacated and recalculated. Indeed, those class members who chose vouchers would be unlikely to change their elections predicated on a potentially small increase in the individual cash award that could result from the recalculation of the attorney's fees award. And the remainder of the class members — that is, those who chose cash — likewise would not change their elections because they might actually receive a benefit

(explaining our reluctance to create circuit split). Our distinguished colleague on the district court will be permitted to decide the issue in the first instance, after any necessary development by the parties.

37

when the attorney's fees award is recalculated. *See In re Easysaver Rewards Litig.*, 906 F.3d at 763 (affirming settlement despite vacating attorney's fees award because, inter alia, class members would not have made different decisions had they known that fees award would be recalculated). Our vacatur of the Attorney's Fees Order therefore does not require us to vacate the Settlement Approval Order. *See Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968-69 (9th Cir. 2009) (affirming class-action settlement approval but vacating attorney's fees award); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 290 (3d Cir. 1998) (same).

## IV.

Pursuant to the foregoing, we affirm the Settlement Approval Order, vacate the Attorney's Fees Order, and remand for such other and further proceedings as may be appropriate.

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*